Nicholas R. Lawson
Avi Moshenberg
**LAWSON & MOSHENBERG PLLC**
2301 Commerce St., Suite 200
Houston, TX 77002
Tel: (903) 316-9155
Nick.Lawson@lmbusinesslaw.com
Avi.Moshenberg@lmbusinesslaw.com

*Counsel for Lags Equipment, LLC*

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | **Chapter 11** |
| | § | |
| **Hooters of America, LLC, et al.,**[1] | § | **Lead Case No. 25–80078 (SWE)** |
| | § | |
| | § | **Jointly Administered** |
| Debtors. | § | |

| | | |
|---|---|---|
| **Lags Equipment, LLC,** | § | |
| | § | |
| Plaintiff | § | |
| | § | |
| v. | § | **Adversary No. 25–_____** |
| | § | |
| **Celtic Master Fund LP,** | § | |
| *et al.,* | § | |
| | § | |
| Defendants. | § | |

---

[1]     The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification  number are: Hooters of America, LLC (5288); Owl Holdings, LLC (3103); Hawk Parent, LLC (2323); HOA Holdings, LLC (1180); Night Owl, LLC (4511); Owl Wings, LLC (4583); Owl Restaurant Holdings, LLC (7751); HOA Restaurant Group, LLC (7654); Derby Wings Holdings, LLC (8081); Derby Wings, LLC (6578); HOA Gift Cards, LLC (3684); Elf Owl Investments, LLC (3342); TW Lonestar Wings, LLC (3465); Alamo Wings, LLC (3702); HOA Holdco, LLC (8828); HOA Systems, LLC (2439); HOA Funding, LLC (4390); HOA Restaurant Holder, LLC (3883); HOOTS Restaurant Holder, LLC (5840); HOA IP GP, LLC (9555); HOOTS Franchising, LLC (8375); HOA Franchising, LLC (4451); HOA Maryland Restaurant Holder, LLC (1608); HOA Kansas Restaurant Holder, LLC (9045); TW Restaurant Holder, LLC (6927); DW Restaurant Holder, LLC (8261); HI Limited Partnership (2355); HOA Towson, LLC (1942); HOA Waldorf, LLC (5425); HOA Laurel, LLC (5010). The Debtors' service address is 1815 The Exchange SE, Atlanta, GA 30339.

**COMPLAINT FOR DECLARATORY JUDGMENT; CONFIRMATION OF VALIDITY, EXTENT AND PRIORITY OF SECURED CLAIMS; INTENTIONAL INTERFERENCE WITH CONTRACT; CHALLENGING DIP LOAN STIPULATIONS AND RELATED RELIEF PROVIDED IN FINAL DIP ORDER; AND FOR RELATED RELIEF**

Plaintiff Lags Equipment, LLC ("**Lags**" or "**Plaintiff**")[2] is the owner of a royalty interest and a secured creditor in the above-styled Chapter 11 cases (the "**Cases**"). Lags files this complaint ("**Complaint**") against: (1) Celtic Master Fund LP and any affiliates and other persons who may become lenders under the DIP Facility (as that term is defined in the Final DIP Order[3]); (2) U.S. Bank and Trust Company, National Association as collateral agent and calculation agent for the DIP Facility (the "**DIP Lenders**"), (3) XYQ Cayman Ltd., (4) Citibank, N.A., and (5) Drivetrain Agency Services, LLC, (collectively, "**Lender Defendants**"), and BCI, Botticelli LLC, Guggenheim Partners Investment Management, LLC, Marathon Asset Management, LP, River Canyon Fund Management LLC, TCW Asset Management Company LLC, and Victory Capital Management Inc. (collectively, "**Ad Hoc Noteholder Defendants**") and states as follows:

## JURISDICTION, VENUE, AND CONSTITUTIONAL AUTHORITY

1.      The Court has jurisdiction pursuant to 28 U.S.C. §§ 1334(b) and 157(b)(1) because this adversary proceeding arises in, is related to, and arises under the chapter 11 case, *Hooters of America, LLC, et al.*, pending in the United States Bankruptcy Court for the Northern District of Texas, Dallas division, jointly administered as Case No. 25–80078.

2.      This adversary proceeding is a core proceeding pursuant to 28 U.S.C. §157(b)(2)(A) and (O).

---

[2]      In the interests of consistency and concision, references to "Lags" herein also include Lags Equipment, LLC's predecessors-in-interest where appropriate.

[3]      As used herein, the term "Final DIP Order" means the Court's *Final Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (III) Modifying the Automatic Stay, and (IV) Granting Related Relief* [ECF No. 299] (the "**Final DIP Order**").

3.      Plaintiff consents to the entry of final orders or judgment by the bankruptcy judge if it is determined that the bankruptcy judge, absent consent of the parties, cannot enter final orders of judgment consistent with Article III of the United States Constitution.

4.      Venue is proper in this District pursuant to 28 U.S.C. § 1409(a).

5.      This proceeding has been brought in accordance with Rule 7001(a), (b), (g), (h) and (i) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").

## THE PARTIES

6.      Defendant Celtic Master Fund LP, lead DIP Lender (as that term is defined in the Final DIP Order) in these Cases, is a limited partnership organized and existing under the laws of the Cayman Islands, and may be served with process through the Hague convention, by serving its registered office at One Nexus Way, c/o Waystone Corporate Services (Cayman) Ltd., Camana Bay, Grand Cayman, KY1-1108, Cayman Islands, or c/o Waystone Corporate Services (Cayman), Suite 5B201 2nd Floor, One Nexus Way, P.O. Box 2587, KY1 1103, Cayman Islands, or wherever it may be found; and

7.      Defendant U.S. Bank and Trust Company, National Association, collateral agent and calculation agent for the DIP Facility, LLC is a National Banking Association formed under the law of the United States, and may be served with process at One Federal Street, 3rd Floor, Boston, MA 02110, or wherever it may be found. It may also be served with process through its counsel, Juliana Hoffman of Sidley Austin LLP, 2021 McKinney Avenue, Suite 2000, Dallas, TX 75201 along with Kathleen LaManna and Kimberly S. Cohen of Shipman & Goodwin LLP, One Constitution Plaza, Hartford, CT 06103 or wherever they may be found.

8.      Defendant XYQ Cayman Ltd., is a Cayman limited company organized and existing under the laws of the Cayman Islands, and may be served with process through the Hague

convention, by serving it at its registered office at P.O. Box 1344, One Nexus Way, c/o Waystone Corporate Services (Cayman) Ltd., Camana Bay, Grand Cayman, KY1-1108, Cayman Islands, or c/o Waystone Corporate Services (Cayman), Suite 5B201 2nd Floor, One Nexus Way, P.O. Box 2587, KY1 1103, Cayman Islands, or wherever it may be found.

9.      Defendant Citibank, N.A. is a National Banking Association formed under the law of the United States, and may be served with process at 388 Greenwich Street, 14th Floor, New York, NY 10013, or wherever it may be found.

10.      Defendant Drivetrain Agency Services, LLC, is a limited liability company organized under the laws of New York, with a principal place of business in New York, New York, and may be served through the New York Secretary of State's Office, through its counsel Seward & Kissel LLP at One Batter Park Plaza, New York, NY 10004, or wherever it may be found.[4]

11.      BCI is a New York entity, organized under the laws of New York, and is located at 745 Seventh Avenue, 2nd Floor, New York, New York 10019, and may be served through the New York Secretary of State's Office, through its counsel Gray Reed, 1601 Elm Street, Suite 4600, Dallas, Texas 75201, White & Case LLP, 200 South Biscayne Boulevard, Suite 4900, Miami, Florida 33131, or wherever it may be found.

12.      Botticelli LLC is a limited liability company, organized under the laws of Delaware, and is located at 4001 Kennett Pike, Suite 302, Wilmington, DE 19807, and may be served through its registered agent Maples Fiduciary Services (Delaware) Inc., at 4001 Kennett Pike, Suite 302, Wilmington, DE 19807, through its counsel Gray Reed, 1601 Elm Street, Suite

---

[4]      Defendants Celtic Master Fund LP, U.S. Bank and Trust Company, National Association, XYQ Cayman Ltd., Citibank, N.A., and Drivetrain Agency Services, LLC are collectively referred to as "**Lender Defendants**."

4600, Dallas, Texas 75201, White & Case LLP, 200 South Biscayne Boulevard, Suite 4900, Miami, Florida 33131, or wherever it may be found.

13.     Guggenheim Partners Investment Management, LLC is a limited liability company, organized under the laws of Delaware, and may be served through its registered agent United Agent Group Inc., 600 Mamaroneck Avenue, #400, Harrison, NY 10528, through its counsel Gray Reed, 1601 Elm Street, Suite 4600, Dallas, Texas 75201, White & Case LLP, 200 South Biscayne Boulevard, Suite 4900, Miami, Florida 33131, or wherever it may be found.

14.     Marathon Asset Management, LP is a limited partnership, organized under the laws of Delaware, and may be served through its registered agent Corporation Services Company, 80 State Street, Albany, NY 12207-2543, through its counsel Gray Reed, 1601 Elm Street, Suite 4600, Dallas, Texas 75201, White & Case LLP, 200 South Biscayne Boulevard, Suite 4900, Miami, Florida 33131, or wherever it may be found.

15.     River Canyon Fund Management LLC is a limited liability company, organized under the laws of Delaware, and may be served through its registered agent Cogency Global Inc., 1601 Elm St., Suite 4360, Dallas, Texas, through its counsel Gray Reed, 1601 Elm Street, Suite 4600, Dallas, Texas 75201, White & Case LLP, 200 South Biscayne Boulevard, Suite 4900, Miami, Florida 33131, or wherever it may be found.

16.     TCW Asset Management Company LLC is a limited liability company, organized under the laws of Delaware, and may be served through its registered agent National Registered Agents, Inc., 28 Liberty Street, New York, NY, through its counsel Gray Reed, 1601 Elm Street, Suite 4600, Dallas, Texas 75201, White & Case LLP, 200 South Biscayne Boulevard, Suite 4900, Miami, Florida 33131, or wherever it may be found.

17.    Victory Capital Management Inc. is a corporation, organized under the laws of Delaware, and may be served through its registered agent Corporation Service Company, 84 State Street, Boston MA 02109, through its counsel Gray Reed, 1601 Elm Street, Suite 4600, Dallas, Texas 75201, White & Case LLP, 200 South Biscayne Boulevard, Suite 4900, Miami, Florida 33131, or wherever it may be found.[5]

## FACTUAL ALLEGATIONS

### I.  Lags' Royalty Rights, Secured Claims, and Intellectual-Property Rights Span Decades.

18.    Lags owns a royalty interest relating to the operation of Hooters restaurants and use of the Hooters brand and marks in the Lags Territories. It has first-priority, perfected security interests in collateral tailored to secure payment of those royalties, and has the rights to enforce intellectual-property rights tailored to protect its rights to payment of those royalties.  Lags and its predecessors have owned these rights and have had a close relationship with the Debtors and their predecessors for *over 36 years*. Now, the Debtors have called Lags' royalty interests into question and announced their intent to invalidate Lags' interests—which royalty rights, security interests, and intellectual-property rights have been uniformly acknowledged, confirmed, ratified, and otherwise documented through binding agreements executed by the Debtors and their predecessors over the last three decades.

19.    In support of this Complaint, Lags refers to the *Declaration of Rich Simeone in Support of Lags Equipment, LLC's Objection to Final Relief on Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Claims With*

---

[5]    Defendants BCI, Botticelli LLC, Guggenheim Partners Investment Management, LLC, Marathon Asset Management, LP, River Canyon Fund Management LLC, TCW Asset Management Company LLC, and Victory Capital Management Inc. are collectively referred to as "**Ad Hoc Noteholder Defendants**."

*Superpriority Administrative Expense Status, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing and (V) Granting Related Relief* [Dkt. 205-1] (the "**Simeone Declaration**") filed in these cases on April 23, 2025.

   **A. In 1984, Hooters Intellectual Property was First Licensed For Use—the Original License Agreement.**

20.      In 1984, Hooters, Inc. ("**HI**") owned the rights to the Hooters brand, marks, and associated intellectual property (the "**Hooters IP**").

21.      Through that certain license agreement dated July 21, 1984 (the "**Original License Agreement**") (a true and correct copy of which is attached to the Simeone Declaration as **Exhibit A**), HI licensed certain Hooters IP to Hooters of America, Inc. ("**HOA**").[6]

22.      Under the terms of the Original License Agreement, HI licensed certain Hooters IP to HOA, in perpetuity, in exchange for $10,000 (and a prepayment of $40,000), plus HOA's agreement to pay HI 3% of future gross revenue in connection with HOA's future operation of Hooters-branded restaurants (the "**Original Royalty Rights**") (Simeone Decl., ¶ 4).

23.      In the Original License Agreement, HI retained the title and interest in the Hooters IP and only licensed to HOA the right to use the same.  The Original License Agreement contemplated that the Licensor retains all remedies available should HOA breach any other provision other than Section 2 of the agreement.

24.      HOA granted to HI a security interest to secure HI's Original Royalty Rights.

25.      Following execution of the Original License Agreement, HOA failed to sufficiently expand the Hooters brand and regularly failed to timely make royalty payments to HI.

---

[6]      Hooters of America, Inc. is a successor in interest to Neighborhood Restaurants of America, Inc. and predecessor in interest to Debtor Hooters of America, LLC. In the interest of clarity and concision, the defined term "HOA" herein includes Neighborhood Restaurants of America, Inc. and Hooters of America, LLC as applicable.

**B. In 1989, HI Assigned a Portion of the Original Royalty Rights to Lags and Became Lags' Servicing Agent for those Assigned Royalty Funds—the 1989 Assignments.**

26.     In 1989, HI sold a portion of the Original Royalty Rights to Lags, specifically 3% of gross revenue (the "**Lags Royalty**") from all Hooters-branded restaurants operating within certain identified territories (the "**Lags Territories**"). (Simeone Decl., ¶ 5).  Among other things, HI entered into this sale and assignment of rights because Lags' predecessor in interest, David Lageschulte, was undertaking to expand the Hooters brand and establish new Hooters restaurants in the Lags Territories within the State of Florida.

27.     The 1989 assignment was effectuated by three assignment agreements:

a.     that certain *Assignment Agreement* regarding certain Florida territories, dated February 10, 1989, by and between HI and L. D. Stewart, Gilbert Di Giannantonio, William Ranieri, Edward C. Droste, Kenneth Wimmer and Dennis Johnson, and Lags (the "**February 1989 Florida Assignment**");

b.     that certain *Assignment Agreement* regarding certain Florida territories, dated May 11, 1989, by and between HI and Lags (the "**March 1989 Florida Assignment**");

c.     that certain *Assignment Agreement* regarding Indiana, Ohio, and Texas, dated May 11, 1989, by and between HI, and Lags (the "**1989 IN/OH/TX Assignment**", and collectively with the foregoing 1989 Assignment Agreements, the "**1989 Assignments**"). (Simeone Decl., ¶ 6).

28.     Under the 1989 Assignments, true and correct copies of which are attached to the Simeone Declaration as **Exhibit B**, the Lags Royalty is due and payable directly from the specific restaurant stores operating within the Lags Territories, and HI expressly acted merely as a passthrough "servicing agent" to collect the Lags Royalty from the restaurants obligated to remit to Lags all sums collected in connection with the Lags Royalty (the "**Lags Passthrough Funds**"), without any commission, fee or other rights. Lags has retained ownership of the Lags Royalty, without exception, for the past 36 years.

a.     Paragraph 1 of the February 1989 Florida Assignment stated that:

> *[HI] shall continue to receive all such royalty payments from [HOA] and act as the servicing agent for [Lags]* and [HI] agrees to remit to [Lags] all such payments within five (5) working days of receipt of said royalty fees . . . .

b.  Paragraph 2(e) of both the March 1989 Florida Assignment and the 1989 IN/OH/TX Assignment similarly stated that:

> *[HI] shall continue to receive all such royalty payments from [HOA] and act as the servicing agent with respect to the above restaurants.* [HI] agrees to remit to [Lags] all such royalty payments within five (5) working days of receipt of said royalty fees from [HOA] (emphasis added) (Simeone Decl., ¶ 7).

29.  The February 1989 Florida Assignment also expressly conferred to Lags HI's security interests in the royalty payments.  Paragraph 1 of the February 1989 Florida Assignment stated: "[HI] agrees to assign its currently existing security interest in the right to receive three percent (3%) of the gross proceeds as a royalty payment from [HOA] of the gross revenues of restaurants owned and operated by [Lags]." (Simeone Decl., ¶ 8).

## C. In 1996, HI Acknowledged the Validity of the 1989 Assignments and Lags' Exclusive Ownership of the Lags Royalty—the 1996 Consent

30.  In 1996, HI executed that certain Consent to Collateral Assignment (the "**1996 Consent**"), a true and correct copy of which is attached to the Simeone Declaration as **Exhibit C**), whereby Lags pledged the Lags Royalty as collateral to a secured creditor.  By the 1996 Consent, HI confirmed that it had previously transferred, sold and assigned the Lags Royalty to Lags, as follows: "[HI] acknowledges, approves, agrees, and consents as follows: (a) it has transferred, sold, and/or assigned to [Lags] the "Royalties" and the assignment by Hooters of the "Royalties" and such transfer, sale, assignment is valid and binding . . . ."  This is the first of many times following the 1989 Assignments that the Debtors acknowledged, in a legally binding document, with the advice of counsel, that Lags is the sole and legitimate owner of the Lags Royalty. (Simeone Decl., ¶ 9).

**D. In 1999 and 2001, HOA Acquired HI's Assets and Stepped into HI's Shoes as Lags' Servicing Agent—the 1999 and 2001 Settlement and Assumption Agreements; the 2001 Security Agreement**

31.     Through agreements entered in 1999 and 2001, HOA purchased all, or substantially all, of HI's assets.

32.     The purchased assets did not include, and could not have included, the Lags Royalty because that asset had been sold by HI to Lags in 1989 through the 1989 Assignments.

33.     In recognition thereof, the purchase and sale documents expressly: (i) referenced the Lags Royalty and carved it out of the sale transaction; and (ii) confirmed that HOA stepped into HI's shoes as the servicing agent for the Lags Royalty to collect all royalties from the restaurant in the Lags Territory and remit to Lags the Lags Passthrough Funds purely in a functionary, passthrough capacity without any commission, fee or other rights.

34.     Relevant provisions of these 1999 and 2001 agreements include:

a.  Paragraph 7(e) of that certain *Settlement and Amendment to License Agreement*, dated September 13, 1999, by and among HI, HOA, and certain other parties (the "**1999 Amendment**", a true and correct copy of which is attached to the Simeone Declaration as **Exhibit D**), which provided:

> At Closing, and from and after the date of Closing, ***HOA shall assume HI's obligation to collect from HOA and pay over to [Lags] the royalty of Three Percent (3%) of the gross sales of HOOTERS® restaurants in the states of Indiana, Ohio, Texas and the Lags South Florida territory* . . . . *HOA shall also take all reasonable commercial steps necessary to substitute itself as the debtor under any security agreements and financing statements which secure the payment of those royalties***, and shall indemnify and hold harmless HI from and against any further obligation on its part to collect and pay over to Lags any amounts associated with such royalty payments from and after the Closing . . . . (emphasis added).

b.  Paragraph 3(d) of that certain *Amendment to Settlement and Amendment to License Agreement*, dated March 21, 2001, by and among HI (individually and as general partner of the HI Limited Partnership ("**HILP**"), HOA, and certain other parties (the "**2001 Amendment**", a true and correct copy of which is attached to the Simeone Declaration as **Exhibit E**), provided:

*Non Merger (e.g., §7(c)).* All portions of any and all sections or subsections of the Agreement that provide or imply that the [1984] License Agreement will be terminated, extinguished, or otherwise merged out of existence upon the transfer of the partnership interests from HI to HOA or its assignees contemplated to occur when HOA closes on the Option (including, but not limited to §7(c)) hereby are deleted or otherwise nullified. Instead, ***the License Agreement shall survive the closing of the Option and the transfer of partnership interests in [HILP] to HOA and its assignees.*** (emphasis added).

c.  Paragraph D of the recitals of that certain *Assumption, Indemnification and Hold Harmless and Debtor Substitution and Release Agreement*, dated March 21, 2001, among HI, HOA, HILP (referred to collectively therein as the "HOA Entities"), Lags, and a certain other Hooters entity (the "**2001 Assumption**" a true and correct copy of which is attached to the Simeone Declaration as **Exhibit F**), which provided:

D. ***The License Agreement will survive HOA's closing of the Option and will not be merged out of existence by that closing***, notwithstanding anything to the contrary in the Settlement Agreement and any documents executed in the closing of the Option. (emphasis added)

d.  Paragraph 3(a) and (b) of the 2001 Assumption further provide that:

(a) ***The HOA Entities shall not take, permit or consent to any action that will lower the royalty rate or amount of the Lags Royalties***.

(b) ***The HOA Entities shall take no action, nor will they suffer any action to be taken*** that will impair the HILP's right to receive royalties under the License Agreement or ***that will impair the HOA Entities' obligation or ability to remit the Lags Royalties to [Lags]. In addition, the HOA Entities are contemporaneously executing a Security Agreement and appropriate financing statements (collectively, the "Security Agreement") to grant [Lags] a perfected first security interest in the collateral described in that Security Agreement, which Security Agreement and perfected security interest shall be continuously maintained so as to always secure [Lags'] right to receive the Lags Royalties***. (emphasis added). (Simeone Decl., ¶ 10).(emphasis added). (Simeone Decl., ¶ 10).

35.    The 2001 agreements also include that certain Security Agreement, dated March 2001, among HOA and HILP (referred to collectively therein as the "Debtor") and Lags (the "**2001**

**Security Agreement**", a true and correct copy of which is attached to the Simeone Declaration as

**Exhibit G**). Exhibit A to the 2001 Security Agreement describes Lags' collateral (the "**Lags**

**Collateral**") as follows:

> All of Debtor's right, title, and interest in the following described personal property, and all proceeds and products thereof:
>
> A. All now existing and hereafter arising right of Debtor, however derived, and whether directly or through franchisees, licensees, or other third parties, to receive, three percent (3%) of (a) the gross sales of all Hooters Restaurants in the states of Indiana, Ohio, Texas, and the the (*sic*) Florida counties of Manatee, Sarasota, Charlotte, Lee, Collier, Dade, Broward, Monroe, Palm Beach, Glades, and Hendry (collectively the "Territories"), and (b) to the extent not included in subparagraph (a), all future royalties, franchise fees or other payments due to the Debtor with respect to Hooters Restaurant within the Territories; and
>
> B. Accounts of Debtor, to the extent any of the collateral described in A. above, and any unpaid portion thereof, is considered accounts, as that term is now or hereafter defined by the Uniform Commercial Code as enacted in the state in which a Financing Statement is filed or recorded; and
>
> C. General intangibles of Debtor, including without limitation contract rights, to the extent (only) any of the collateral described in A. above is considered general intangibles, or contract rights, as those terms are now or hereafter defined by the Uniform Commercial Code as enacted in the state in which a Financing Statement is filed or recorded; and
>
> D. All supporting obligations of any of the collateral described in A, as that term is now or hereafter defined by the Uniform Commercial Code as enacted the state in which a Financing Statement is filed or recorded; and
>
> E. All substitutes and replacements for, and other additions to, any of the foregoing; and
>
> F. All ledger sheets, files, records, documents, instruments, and other books and records (including that portion of computer programs, tapes, and related electronic data processing software) evidencing an interest in any of the foregoing property; and

G. All cash proceeds of any of the foregoing property. (Simeone Decl., ¶ 11).

36.     The Lags Collateral described in the 2001 Security Agreement is closely tailored to the Lags Royalty, so as to secure Lags' rights with respect thereto.  The Lags Collateral consists of and is directly tied to the Debtors' receipt of the 3% royalty from the restaurants in which the Debtors serve as servicing agent for Lags, the royalty funds themselves, and all associated rights, which is intended to ensure that Lags can monitor and enforce the Lags Royalty. Lags owns and is entitled to every dollar of the royalty streams that its security interests relate to, and those security interests exist to further protect Lags' interests in those royalties in relation to any other secured party that may assert a blanket or specific interest in such funds.  (Simeone Decl., ¶ 12).

37.     The 2001 Security Agreement also provided that Lags is entitled to collect its 3% royalty directly from any franchisee or licensee, as follows:

> (b) When an Event of Default occurs, all Obligations become immediately due and payable at [Lags'] option, and to the extent practical or possible without notice to Debtor, and [Lags] may proceed to enforce payment of the Obligations and exercise any and all of the rights and remedies available to a secured party under the Uniform Commercial Code. ***Without limiting the foregoing: [Lags] may enforce and directly collect the obligations of franchisees, licensees, account debtors and others obligated on, under, or with respect to any Collateral, and Debtor hereby irrevocably authorizes [Lags] to direct any franchisee, licensee, account debtor to pay any amounts owed to [Lags] directly to [Lags] rather than to Debtor***, and in this connection Debtor, upon the giving of such direction, hereby directs the party obligated to Debtor to pay all obligations and amounts directly to [Lags] and hereby releases that party from any and all liability to Debtor as a result of paying the [Lags] pursuant hereto. (emphasis added).[7] (Simeone Decl., ¶ 13).

---

[7]     2001 Security Agreement at ¶. 8(b).

**E. In 2004, HOA Acknowledged that it Receives and Holds Royalty Funds for Lags' Benefit—the 2004 Acknowledgment and Consent**

38.    In July 2004, HOA and HILP executed an Acknowledgment and Consent by Hooters Entities (the "**2004 Acknowledgment and Consent**", a true and correct copy of which is attached to the Simeone Declaration as **Exhibit H**) warranting: "[t]hat [HOA and HILP] hold the Royalty Income for the benefit of [Lags]." (Simeone Decl., ¶ 14). In the 2004 Acknowledgment and Consent, both HOA and HILP further warranted that they "have not received any notice that any person other than [Lags is the] sole owner[] of those royalty rights [in the Lags Territory]."[8]

**F. In 2015, Lags Agreed to a Temporary Royalty Reduction, and HOA Acknowledged Lags' First Priority, Perfected Security Interests and HOA's Role as Lags' Servicing Agent—the 2015 Limited Royalty Reduction Agreement and Consent to Assignment**

39.    In 2015, HOA, HILP, and Lags entered into a Limited Royalty Reduction Agreement (the "**2015 Royalty Reduction Agreement**", a true and correct copy of which is attached to the Simeone Declaration as **Exhibit I**), in which HOA again acknowledged and reinforced that the Lags Royalty is Lags' sole property, and not HOA's or its affiliates', and that:

a.  Lags "has a perfected first priority security interest in" the Lags Collateral;

b.  "[HOA and HILP] shall take no action, nor will they cause or permit any action to be taken, that would impair their obligation or ability to remit the Lags Royalty to [Lags], or its designee;"

c.  "[HOA and HILP] will notify any third parties taking a security interest in the assets of either of the HOA Entities where the description of the related collateral could be interpreted to include the Lags Royalty . . . that the Lags Royalty cannot be pledged or encumbered by [HOA and HILP] for any reason or under any circumstance; and"

d.  "[HOA and HILP] may grant security interests in their assets, but shall at no time grant a security interest in the Lags Royalty". (emphasis added) (Simeone Decl., ¶ 15).

---

[8]    2004 Acknowledgment and Consent ¶ 2.

40.    In 2015, the Debtors also executed that certain Consent to Collateral Assignment of Royalties (the "**2015 Consent**" attached to the Simeone Declaration as **Exhibit K**), dated on or about June 4, 2015, in which HOA and HILP acknowledged and consented to the collateral assignment of the Lags Royalty by Lags. Paragraph 1.4 of the 2015 Consent stated that: "***[Lags] own[s] the [] Royalty rights*** and, in the event of a default by [HOA and HILP], [has] the right to collect such Royalties directly from the operators of the Hooters Restaurants in the above described territories. ***[HOA and HILP] collect[ ] such Royalties from the operators of the Hooters Restaurants in the above described territories on behalf of and as the servicing agent for [Lags]; and pays such Royalties to [Lags] on receipt of the same under the above described agreements***." (emphasis added). (Simeone Decl., ¶ 17).

### G. In 2024, Lags Agreed to Another Temporary Royalty Reduction, and HOA (on Behalf of all Debtors) Again Acknowledged Lags' Ownership Lags of the Lags Royalty (and the Scope and Validity Thereof)—the 2024 Temporary and Limited Royalty Reduction Agreement

41.    As recently as 2024, HOA again executed a legally binding document acknowledging that the Lags Royalty is the sole property of Lags and the Debtors have no interests therein. HOA executed that certain Temporary and Limited Royalty Reduction Agreement (the "**2024 Royalty Reduction Agreement**", a true and correct copy of which is attached to the Simeone Declaration as **Exhibit L**), dated March 6, 2024, by and among HOA and HILP (referred to therein collectively with HOA and any predecessor, successor, affiliate or related party entity thereto collectively referred to as the "HOA Entities"), on the one hand, and Lags, on the other hand, which confirmed the foregoing facts and included the HOA Entities' express acknowledgement and agreement that "***the Lags Royalty is not owned by any of the HOA Entities***," and that HOA has never had the authority to do, or permit to be done, anything that would alter or impair Lags' ownership of the Lags Royalty. (emphasis added). The HOA Entities

further agreed that "[Lags], as the Licensor under the 1984 License Agreement with respect to the Lags Territory, has no obligation of performance whatsoever to any of the HOA Entities," and furthermore that "***the right to operate a Hooters Restaurant and/or otherwise utilize the Hooters brand and marks in the Lags Territory is subject to the Lags Royalty Obligation and payment of the Lags Royalty to [Lags]***." (Simeone Decl., ¶ 18).

42.     Furthermore, the recitals of the 2024 Royalty Reduction Agreement provide that:

> WHEREAS, the HOA Entities, on their behalf and on behalf of any predecessor, affiliate and/or related entities, acknowledge that [Lags] has a perfected first priority security interest in the Lags Royalty, and represent and warrant that no HOA Entity has ever had the authority to do, or permit to be done, anything that would alter or impair [Lags] ownership of and right to a perfected first priority security interest in the Lags Royalty now or in the future; and
>
> . . . .
>
> WHEREAS, (i) the HOA Entities, on their behalf and on behalf of any predecessor, successor, affiliate and/or related entities, have and will notify any third parties taking a security interest in the assets of either of the HOA Entities where the description of the related collateral could be interpreted to include the Lags Royalty (an "HOA Secured Party") that the Lags Royalty has not and cannot be pledged or encumbered by the HOA Entities (or any affiliate or successor entities) for any reason or under any circumstance; (ii) the HOA Entities have granted a security interests in their assets, but shall at no time did they, individually or collectively or through a predecessor, affiliate and/or related company, grant a security interest in the Lags Royalty, which is not an asset of any of the HOA Entities; . . . . (Simeone Decl., ¶ 19).

43.     The 2024 Royalty Reduction Agreement makes at least the ninth legally binding agreement, spanning the nearly 30-year period from 1996 to 2024, in which a Debtor or one of the Debtors' predecessors acknowledged that Lags (or one or more of its predecessors) is the sole and exclusive owner of the Lags Royalty and the extensive scope of Lags' rights.

44.     From and after the Debtors' grant of a security interest to Lags in the Lags Collateral, UCC financing statements and continuation statements confirming such security

interest have been routinely and continuously filed in numerous states, including Florida, Texas,

Georgia, and Delaware.  (Simeone Decl., Ex. J).  Lags therefore has valid, enforceable, and first-

priority perfected security interests in connection with the Lags Royalty and the Lags Passthrough

Funds.

**II.     The Debtors and the Bankruptcy Filing - Despite the Long and Collaborative History
Between Lags and the Debtors, the Debtors Purposely Excluded Lags From Their
Prepetition Restructuring Efforts to Cause Lags to Rely on the Debtors' Prior
Agreements, to Lags' Detriment.**

45.     The Debtors first hired restructuring professionals as early as June 2024 and began

the restructuring efforts that led to the filing of these Cases in earnest in November 2024, after

engaging SOLIC in October 2024.[9]   The Debtors contacted over 95 parties about the efforts,

entered into 38 NDAs, "[h]eld extensive diligence calls" and "facilitated constructive counterparty

engagement."[10] The Debtors further state that "[a]mong other things, the Company held extensive

diligence calls to explain the Company's business trajectory and profile and sought to encourage

parties to engage constructively in turn."[11] The Koutsonicolis Declaration states that the services

SOLIC provided during this period included: "soliciting and analyzing multiple transaction

proposals from various third-party investors" and "meeting with the Debtors' existing creditor

groups and their respective advisors in order to negotiate potential restructuring solutions . . . ."[12]

These efforts culminated in March 31, 2025 with the RSA's execution[13] and the Cases' filing.

46.     At no point during the Debtors' approximate 9-month process of exploring

restructuring options and engaging stakeholders did the Debtors advise Lags about such potential

---

[9]      ECF No. 74 at p. 11.

[10]     *Id*.

[11]     ECF No. 19 at ₱40.

[12]     ECF No. 18 at ₱8.

[13]     ECF No. 74 at p. 11.

restructuring matters, or even to notify Lags that the Debtors were giving serious consideration to restructuring transactions that depend on the reduction or full elimination of Lags' legitimate, long-standing royalty rights.

47.     The Debtors have presented testimony to this Court describing the Lags Royalty as one of the "challenges" driving the filing of these Cases.

48.     The temporary Reduced Royalty Rate in the 2024 Royalty Reduction Agreement was still in place until early 2025 when the Debtors failed to make the final Lags Royalty Payment owed for 2024 and completely stopped remitting royalty funds to Lags in 2025, with no explanation given.

49.     By their silence, the Debtors induced Lags to continue its performance under the 2024 Royalty Reduction Agreement during the very time period that the Debtors were negotiating an RSA to nullify the Lags Royalty altogether.

50.     Given the long history between Lags and the Debtors, Lags was blindsided to discover that the Debtors apparently communicated with all other stakeholders regarding a restructuring proposal, and said proposal hinged on invalidating the uncontested Lags Royalty.[14]

51.     Specifically, the Debtors may have attempted to pledge the Lags Passthrough Funds to the Lender Defendants, who comprise of entities who participated in the Debtors' RSA for post-petition financing and use of cash collateral in essentially exchange for priority claims over assets

---

[14]     *See* DIP Motion at ¶26, n.7 [ECF No. 4 at p. 40-41] ("The Company does not concede nor consent to such Legacy Royalty Obligations as being true royalties and generally reserves all rights and defenses in connection with the Legacy Royalty Obligations and to challenge any purported liens asserted in connection therewith."); First Day Declaration at ¶31, n. 3 (same). Plaintiff incorporates the DIP motion and the First Day Declaration into this pleading.

that include Lags' royalty interest.[15] As a result, the Lender Defendants would be improperly

obtaining Lags' royalty interest—like the Lags Royalty and the Lags Passthrough Funds.

52.    Likewise, the Ad Hoc Noteholder Defendants have also indicated through their

Verified Statement of the Ad Hoc Group of Securitization Noteholders Pursuant to Rule 2019 of

the Federal Rules of Bankruptcy Procedure that they hold an economic interest in the estate,

including security interests.

53.    Lags now asks the Court for a declaratory judgment, damages, and related relief at

law and equity, as follows:

**Count 1 — Declaratory Judgment Regarding
the Validity, Extent, and Priority of Lags' Secured Claims**

54.    The allegations made throughout this pleading are realleged and incorporated here

by this reference.

55.    Lags has a valid lien on the Lags Collateral and secured claim against the Debtors.

And as a result, the Lender Defendants can have no interest in Lags Collateral.

56.    Pursuant to the 2001 Security Agreement, HOA and HILP (defined therein as the

"Debtors") granted Lags a security interest in the Lags Collateral.

57.    The 2001 Security Agreement identifies the obligations secured as including:

> The obligations secured by this Security Agreement are (collectively the
> "Obligations"): the duties, obligations, and liabilities of [HOA and HILP]
> (which assumed all of Hooter's, lnc.'s duties, obligations, and liabilities) to
> [Lags], assigned to [Lags] pursuant those certain Assignments dated May 11,
> 1989 between Hooters, Inc., as Assignor, and David Lageschulte, as Assignee
> (the "Assignments") as well as a subsequent assignment by David
> Lageschulte to [Lags Predecessor Lags Equipment, Inc.], relating to that

---

[15]    Plaintiff also incorporates into this Complaint the following from the main bankruptcy case: (1) the
Court's *Final Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Use Cash
Collateral;, (II) Granting Lines and Providing Claims with Superpriority Administrative Expense Status,
(III) Modifying the Automatic Stay, and (IV) Granting Related Relief* [ECF No. 299] (the "**Final DIP
Order**"); and (2) the Debtors' Proposed Chapter 11 Plan dated May 6, 2025 [ECF No. 261].

certain agreement dated July 21, 1984, between Hooters, Inc. and Neighborhood Restaurants of America, Inc. (n/k/a Hooters of America, Inc.), as amended.

58.    The Debtors granted Lags liens on and security interests in the Lags Collateral similar to those granted to HI under the Original License Agreement when HI owned the Hooters IP.

59.    Exhibit A to the 2001 Security Agreement describes the Lags Collateral as follows

All of Debtors' right, title, and interest in the following described personal property, and all proceeds and products thereof:

A. All now existing and hereafter arising right of Debtor, however derived, and whether directly or through franchisees, licensees, or other third parties, to receive, three percent (3%) of (a) the gross sales of all Hooters Restaurants in the states of Indiana, Ohio, Texas, and the the Florida counties of Manatee, Sarasota, Charlotte, Lee, Collier, Dade, Broward, Monroe, Palm Beach, Glades, and Hendry (collectively the "Territories"), and (b) to the extent not included in subparagraph (a), all future royalties, franchise fees or other payments due to the Debtor with respect to Hooters Restaurant within the Territories; and

B. Accounts of Debtor, to the extent any of the collateral described in A. above, and any unpaid portion thereof, is considered accounts, as that term is now or hereafter defined by the Uniform Commercial Code as enacted in the state in which a Financing Statement is filed or recorded; and

C. General intangibles of Debtor, including without limitation contract rights, to the extent (only) any of the collateral described in A. above is considered general intangibles, or contract rights, as those terms are now or hereafter defined by the Uniform Commercial Code as enacted in the state in which a Financing Statement is filed or recorded; and

D. All supporting obligations of any of the collateral described in A, as that term is now or hereafter defined by the Uniform Commercial Code as enacted the state in which a Financing Statement is filed or recorded; and

E. All substitutes and replacements for, and other additions to, any of the foregoing; and

F. All ledger sheets, files, records, documents, instruments, and other books and records (including that portion of computer programs, tapes, and related electronic data processing software) evidencing an interest in any of the foregoing property; and

G. All cash proceeds of any of the foregoing property.

60.     Lags properly filed UCC-1 Financing Statements, mortgages, security agreements, and other documents that support Lags' assertion of a lien and security interest in the Lags Collateral.

61.     Lags has a valid, first priority, perfected security interest in, lien on, and claim against the Lags Collateral.

62.     The Lags Collateral consists of, and is directly tied to, any of the Debtors' rights to receive, as well as the Debtors' receipt of the 3% royalty from the restaurants in which the Debtors serve as servicing agent for Lags, the Lags Passthrough Funds themselves, and all associated rights including any of the Debtors' rights to obtain payment of such amounts from such restaurants.

63.     Lags owns and is entitled to every dollar in the Debtors' possession or control of the royalty streams that its security interests relate to, and those security interests exist to further protect Lags' interests in those royalties in relation to any other secured party that may assert a blanket or specific interest in such funds.  And to further protect Lags' rights, Lags has a first priority, perfected security interest in the Lags Passthrough Funds in the Debtors' possession or control, as well as in all other property constituting the Lags Collateral.

64.     Lags' protective security interests are entirely consistent with Lags' direct ownership of the Lags Royalty and the Lags Passthrough Funds and merely augment Lags' protection ensuring that any property held by the Debtors in connection with their actions as Lags' servicing agent is protected for Lags benefit.

65.     Indeed, this structure for protecting the royalty stream goes back to the Original License Agreement and the assignment of rights by HI to Lags.  In connection with the Original License Agreement, HOA's predecessor granted HI a security interest in HI's right to receive three percent (3%) of the gross revenues of restaurants as a royalty payment from HOA's predecessor

to HI and a time when HI outright owned the Hooters IP.  Pursuant to the February 1989 Florida Assignment, HI expressly conferred to Lags HI's security interests in the royalty payments, by paragraph 1 thereof in which: "[HI] agrees to assign its currently existing security interest in the right to receive three percent (3%) of the gross proceeds as a royalty payment from [HOA] of the gross revenues of restaurants owned and operated by [Lags]."

66.     As further protection and recognition of Lags' rights, in the event the Debtors fail or refuse to remit the Lags Passthrough Funds to Lags, under the 2001 Security Agreement Lags is entitled to collect its 3% royalty directly from any franchisee, licensee or account debtor of Debtors.

67.     Accordingly, Lags is entitled to declaratory judgment that it has a valid, first-priority, perfected security interest in, lien on, and claim against the Lags Collateral.

68.     Lags is further entitled to a declaratory judgment that the Lender Defendants and Ad Hoc Noteholder Defendants do not have a valid, first-priority, perfected security interest in, lien on, or claim against the Lags Collateral.

### Count 2 — Tortious Interference with Contract or Business Relationships

69.     The allegations made throughout this pleading are realleged and incorporated here by this reference.

70.     "Four elements are required to establish tortious interference with a contractual or business relationship: (1) the existence of a business relationship or contract; (2) knowledge of the business relationship or contract on the part of the defendant; (3) an intentional and unjustified interference with the business relationship or procurement of the contract's breach; and (4) damage to the plaintiff as a result of the interreference." *Howard v. Murray*, 184 So. 3d 1155, 1166 (Fla. 1st DCA 2015).

71.    Lags enjoyed a nearly 30-year business relationship with the Debtors and its predecessors. The business relationship has been ratified over the years in numerous contracts and writings.

72.    The Lender Defendants all knew of the business relationship and contracts between Lags and the Debtors and its predecessors. This includes, without limitation, the fact that Debtors have made multiple representations that they do not own the Lags Royalty, that the Lags Royalty cannot be pledged by Debtors and that Debtors "have not received any notice that any person other than [Lags is the] sole owner[] of those royalty rights [in the Lags Territory]."[16] In fact, the Lender Defendants and the Debtors admitted that they began constructing this reorganization plan in October 2024. This was a mere 7 months after the 2024 Royalty Reduction Agreement whereby Debtors warranted, in part, (i) "*the Lags Royalty is not owned by any of the HOA Entities*", (ii) [Lags] has a perfected first priority security interest in the Lags Royalty, (iii) no HOA Entity has ever had the authority to do, or permit to be done, anything that would alter or impair [Lags] ownership of and right to a perfected first priority security interest in the Lags Royalty now or in the future, (iv) the Lags Royalty has not and cannot be pledged or encumbered by the Debtors for any reason or under any circumstance, and (v) Debtors have granted a security interests in their assets, but shall at no time did they grant a security interest in the Lags Royalty, which is not an asset of any of Debtors.

73.    The Debtors stated that they contacted over 95 parties about these efforts, entered into 38 NDAs, "[h]eld extensive diligence calls" and "facilitated constructive counterparty engagement."[17] The Debtors further state that "[a]mong other things, the Company held extensive

---

[16]    2004 Acknowledgment and Consent ¶ 2.

[17]    ECF No. 74 at p. 11.

diligence calls to explain the Company's business trajectory and profile and sought to encourage parties to engage constructively in turn."[18] The Koutsonicolis Declaration states that the services SOLIC provided during this period included: "soliciting and analyzing multiple transaction proposals from various third-party investors" and "meeting with the Debtors' existing creditor groups and their respective advisors in order to negotiate potential restructuring solutions . . . ."[19] These efforts culminated in March 31, 2025 with the execution of the RSA[20] and the filing of these Cases.

74.    At no point during the 9-month process of devising its restructuring plan was Lags ever advised, or even notified, by the Debtors, or Lender Defendants.

75.    But the Debtors admitted that managing Lags Royalty interest was necessary in reaching a reorganization plan. In fact, the Debtors' testified that the Lags Royalty as one of the "challenges" driving the filing of these Cases.

76.    The Debtors and the Lender Defendants decided that the way to resolve the Lags Royalty challenge was to interfere with and breach Lags' contracts. And the Debtors and the Lender Defendants have done so.

77.    As a result of the Lender Defendants interfering with Lags' contracts with the Debtors, Lags has been damaged in an amount of nearly $2 million in unpaid pre-petition royalties. No royalties have been paid during the pendency of the bankruptcy. And by all accounts, the Debtors and Lender Defendants have no intention of paying royalties after the bankruptcy is concluded.

---

[18]    ECF No. 19 at ¶40.

[19]    ECF No. 18 at ¶8.

[20]    ECF No. 74 at p. 11.

**Count 3 — DIP Loan Challenges**

78.    The allegations made throughout this pleading are realleged and incorporated here by this reference.

79.    This action is brought pursuant to Paragraph 35 of the Final DIP Order[21] to assert a timely Challenge (as defined in the Final DIP Order).

80.    This action challenges the Debtors' assertion of ownership of the Lags Royalty and the Lags Passthrough Funds, and accordingly the ability of the Debtors to pledge, and to have ever pledged, any of those assets to any of the Prepetition Secured Parties and/or any DIP Lender.

81.    Through decades of binding agreements, the Debtors have acknowledged, confirmed, ratified, and otherwise agreed, among many other representations and warranties, that: (i) Lags is the sole and legitimate owner of the Lags Royalty and the Lags Passthrough Funds; (ii) Lags holds a first priority security interest in any property in the Debtors' possession constituting the proceeds of same; and (iii) the Debtors could not grant to any third party any liens on or security interests in the Lags Royalty and the Lags Passthrough Funds, because the Debtors do not own, and have never owned, any interest in the Lags Royalty and the Lags Passthrough Funds.  At a time of financial distress when the Debtors lack any bargaining power, the Debtors now stipulate otherwise.  It would be entirely inequitable to allow the Debtors, due solely to their financial predicament (or bad faith) to suddenly re-write 36 years of history in an ill-fated attempt to restructure their affairs for the benefit of their lenders.

82.    This action challenges the Debtors' Stipulations set forth in Paragraph F of the Final DIP Order (or stated anywhere else in the Final DIP Order) to the extent they provide that the Lags

---

[21]    Any capitalized terms in this Count not otherwise defined herein shall have the meaning ascribed thereto in the Final DIP Order.

Royalty and/or the Lags Passthrough Funds are part of any Prepetition Collateral pledged by any of the Debtors to any of the Prepetition Secured Parties, either as part of the Prepetition Term Loan Collateral, the Prepetition MA Loan Collateral or any other collateral for any other prepetition loan.

83.    This action challenges the extent, validity, enforceability, and perfected status of the Prepetition Liens and the DIP Liens as they relate to Lags and its interests in the Lags Royalty and Lags Passthrough Funds set forth in Paragraph F of the Final DIP Order (or stated anywhere else in the Final DIP Order) to the extent they provide that any Prepetition Secured Parties and/or any of the DIP Lenders has a valid, perfected security interest in, lien on, or claim against the Lags Royalty or the Lags Passthrough Funds.

84.    The Debtors could not have granted to any of the Prepetition Secured Parties and/or any DIP Lender any liens on or security interests in the Lags Royalty and the Lags Passthrough Funds, because the Debtors do not own, and have never owned, any interest in the Lags Royalty and the Lags Passthrough Funds.

85.    To the extent that the Debtors granted to any of the Prepetition Secured Parties and/or any DIP Lender any liens on or security interests in the Lags Royalty and the Lags Passthrough Funds, any such grant is invalid and void ab initio.

86.    None of the Prepetition Secured Parties and no DIP Lender has a valid, perfected security interest in, lien on, or claim against the Lags Royalty or the Lags Passthrough Funds.

87.    Accordingly, the effect of any of the Debtors' Stipulations, admissions, agreements and Releases contained in the Final DIP Orders or any DIP Orders should not and cannot extend to Lags or in any way impair Lags' rights and interests, including with respect to the Lags Royalty and the Lags Passthrough Funds.

88.     Therefore, Lags requests that the Court: (i) find that the Lags Royalty or Lags Passthrough Funds are not property of the estates, (ii) find that the Debtors have no (and never had) authority to pledge the Lags Royalty or Lags Passthrough Funds, (iii) find that the right to operate a Hooters Restaurant and/or otherwise utilize the Hooters IP is subject to the Lags Royalty, and (iv) preserve and validate Lags' ownership and security interests therein.

## **PRAYER**

89.     Accordingly, Plaintiff requests that the Court enter Judgment in its favor as follows:

a.      on Plaintiff's Counts 1 and 3, judgment declaring its rights as set forth above;

b.      on Plaintiff's Count 2, as to the Lender Defendants, judgment confirming that Plaintiff's contracts or business relations have been tortiously interfered with;

c.      award compensatory and punitive damages as appropriate.

d.      an award of attorney's fees and costs; and

e.      such other and further relief as this Court may deem just and proper.

Dallas, Texas
Date: June 17, 2025

Respectfully submitted,

**LAWSON & MOSHENBERG PLLC**

 */s/ Avi Moshenberg*
Nicholas R. Lawson
Texas Bar No. 24083367
Avi Moshenberg
Texas Bar No. 24083532
2301 Commerce St., Suite 200
Houston, TX 77002
Tel: (903) 316-9155
Nick.Lawson@lmbusinesslaw.com
Avi.Moshenberg@lmbusinesslaw.com

*Counsel for Lags Equipment, LLC*